Thomas Watson v. Commissioner. Thomas Watson and Anita F. Watson v. Commissioner.
Watson v. Commissioner
Docket Nos. 2362, 2390.
United States Tax Court
1945 Tax Ct. Memo LEXIS 49; 4 T.C.M. (CCH) 986; T.C.M. (RIA) 45334; October 31, 1945
Thomas Watson, Esq., for the petitioners. J. Harrison Miller, Esq., and Hartford Allen, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion *
*50 MURDOCK, Judge: The Commissioner determined a deficiency in income tax of $13,129.59 for 1938 and a deficiency of $505.32 for 1939. 1 The first issue is whether the petitioner received taxable income of $933 in 1938 as interest on land trust certificates of the Paden City Pottery Company owned by him. Findings of Fact The petitioner is an individual who filed his income tax returns for 1938 and 1939 with the collector of internal revenue for the twenty-third district of Pennsylvania. He used the cash method of reporting. He owned during 1938, 311 units of $50 par land trust certificates issued by Paden City Pottery Company, on which $933 of interest became due during that year. He did not actually or constructively receive this interest during 1938, it was not unqualifiedly subject to his demand during 1938, and he did not report it as income. The Commissioner included it in the income of the petitioner in determining the deficiency. The Paden City Pottery Company was in financial difficulties during 1938 and prior thereto. The petitioner, together with others who owned both certificates and stock, had agreed prior to 1938 with two key employees and a creditor of the *51 corporation that they would not actually draw amounts due them as interest on the certificates but would leave the amounts with the corporation for its use until certain events had occurred. The events had not occurred up to the close of 1938 and the agreements were still in effect. The agreements were carried out as follows: the corporation gave to the trustee for the certificate owners its check for the full amount due at each interest-paying period; the trustee issued its checks to the certificate holders; those made out to the stockholder-certificate holders who were parties to the agreement were returned immediately to the corporation through its president who endorsed the checks in the name of the payees and deposited them to the account of the corporation; and the corporation credited the amount due each to a loan account in his name which was closed in a later year by the issuance of a third preferred stock for the balance in the account. The corporation could not have continued operations had the petitioner and the others been permitted to withdraw the interest on the certificates. Opinion The above findings determine this issue in favor of the petitioner upon a clear *52 preponderance of the evidence. The debtor was not in position to pay him, he recognized that fact, and agreed to the plan whereby he would forego his right to the money for the time being. The Commissioner erred in adding this amount to income for 1938. 2 The second issue is whether the petitioner sustained a loss of $24,523 in 1938 as a result of a debt in that amount due to him from the South Euclid Stone & Supply Company becoming worthless in that year. Findings of Fact The petitioner was the principal stockholder and creditor of the Green Road Stone & Supply Company which owed him $122,774.42. That corporation was insolvent in 1934 and its stockholders and directors resolved to dissolve and liquidate it. The petitioner and his brother were appointed liquidators to sell its assets and distribute the proceeds to its creditors. Worthington, a stockholder, agreed to buy the assets at a fair price of $32,000. He organized South Euclid Stone & Supply Company as his own corporation, to become the purchaser and operator. It gave its notes for $32,000 to the liquidators. The Watsons agreed to pay other debts to Green Road. The notes were secured by a chattel mortgage on the newly *53 acquired assets. The liquidators distributed these notes in 1934 to the petitioner as the principal creditor of Green Road by having the notes made payable to him. The petitioner owned no stock in South Euclid. South Euclid was not successful and the petitioner, in order to assist it and protect his notes, advanced money to it from time to time. Finally, in 1938, he foreclosed his mortgage and bought the remaining assets of South Euclid for $9,000. The net balance of principal due him from South Euclid after the sale was $24,523. The petitioner deducted $10,000 of this debt on his 1937 return as a partially worthless debt. The record does not show whether or not it was allowed. The debt became completely worthless in 1938. The petitioner claimed a deduction on his return for 1938 of $25,749.75 as a worthless debt due from South Euclid. The Commissioner disallowed the deduction claimed. Opinion The respondent complains that there is no evidence to show what became of the claims of creditors of Green Road other than the petitioner, and he argues that the petitioner released South Euclid from all claims of creditors of Green Road, including himself. It is immaterial what became of *54 the claims of other Green Road creditors since the petitioner received the notes in partial payment of his large claim against Green Road. The debts due the petitioner from South Euclid were not debts of Green Road. The notes of South Euclid were to purchase assets of Green Road, and South Euclid was not relieved from the payment of those notes. The debts here in question were real, bona fide obligations which became completely worthless in 1938, according to the evidence in this case. The deduction for 1938 is limited to the balance not previously deducted, $14,523. 3 The third issue is whether the petitioner is entitled to a deduction for 1938 representing a worthless debt due from Grant Mine Coal Company in the amount of $17,472.78 or any other amount. Findings of Fact The petitioner and A. C. Stickel owned in equal shares, all of the stock of Grant Mine Coal Company and of Miller Coal & Coke Company, corporations organized in 1929 and 1928. Each corporation had been engaged in mining coal. The Miller coal had all been mined prior to the period material hereto, but coal was being mined from the Grant mine and sold through Miller. Grant had no bank account, so many of Grant's *55 receipts and disbursements went through Miller's account. The petitioner advanced funds from time to time to Grant, including the period from July 1930 through the early part of 1934. Miller, Grant, and the petitioner entered into a written agreement in 1934 whereby Grant acknowledged that the net amount due from it to the petitioner was $19,720.25. Miller also acknowledged that it owed the petitioner money. Grant, earlier in that same year, at the request of the petitioner, had given a $20,000 bond and mortgage on its property to the Colonial Trust Company of Pittsburgh, to secure loans which the petitioner had obtained there. No payments were ever made on that mortgage. Grant gave a $6,000 mortgage on its property on February 28, 1935 to the petitioner to secure "moneys advanced by him subsequent to August 1, 1934, or which may be advanced by him after this date." The petitioner advanced money to Grant after August 1, 1934. Grant, at the request of the petitioner, conveyed all of its properties, subject to existing encumbrances, to George R. Evans by a deed dated September 9, 1935. Evans paid nothing. He was nominee of the petitioner and held the property for the petitioner. *56 The properties transferred were valuable. Thereafter, Grant had no assets. The petitioner in 1938 obtained permission from the Colonial Trust Company to enter judgment on the bond and sell the former Grant properties provided he paid all expenses. The record does not show whether or not the mortgage was then held by Colonial to secure any debt of the petitioner. The sheriff's sale took place in 1938. The petitioner paid the sheriff $876 to cover costs and taxes. The latter amounted to $744.85. The petitioner, on his return for 1938, claimed a deduction of $22,929 representing a worthless debt due to him from Grant. The Commissioner disallowed the deduction. No debt from Grant Mine Coal Company to the petitioner became worthless in 1938. Opinion The record shows that Grant was indebted to the petitioner in a substantial amount in 1934 and 1935. The petitioner had Grant convey all of its property to his nominee in 1935. The properties were valuable at that time. The petitioner thereafter was the real and equitable owner of all of the properties which had formerly belonged to Grant, although title was in his nominee. He used the properties as an individual. He argues that the *57 nominee received title for the purpose of liquidating the properties for the benefit of all of the creditors, but the evidence does not bear out this contention. The petitioner testified that the properties were transferred by Grant to his nominee at his request so that he could control and manage the properties without corporate action, could stop corporate taxes thereon, and could prevent judgments against Grant from being entered as liens on the properties. Grant, after this transfer, had no assets or means of paying any debt which it owed to the petitioner. The petitioner was not named as mortgagee in the mortgage held by the Colonial Trust Company nor did it mention any debt owed by Grant to the petitioner. Furthermore, the Colonial mortgage, if it did not merge into the fee, was a lien upon property owned by the petitioner after the transfer of the Grant properties to the petitioner's nominee. The foreclosure of the mortgage held by Colonial was not an identifiable event which first fixed and disclosed the worthlessness of the debt due from Grant to the petitioner. That debt had been worthless for several years before that event. Indeed, it is not at all clear that any debt *58 survived the transaction in 1935. The petitioner has not shown that the Commissioner erred in failing to allow him a deduction for 1938 on account of the debt due from the Grant Mine Coal Company. 4 The contention of the petitioner under the fourth issue is that if he is to be recognized as the owner of the former Grant properties during all of 1938, then he is entitled to deductions of $143.23 for taxes and also $601.62 for taxes. The Commissioner concedes that the item of $143.23 is deductible and says it was deducted by the petitioner on his return and allowed. He also concedes that $252.97, representing taxes on the Grant property while owned by the petitioner after September 9, 1935, and forming a part of the item of $601.62, is deductible. He contends, and we agree, that the remainder of this item, representing taxes for periods prior to September 9, 1935 is not deductible for 1938 either as taxes or otherwise, but is a capital expenditure forming a part of the cost of the property. ; . The petitioner does not further contest an adjustment of $745.35 made by the Commissioner to *59 include in his income, income from the former Grant properties. The fifth issue is whether the petitioner is entitled to a deduction for a loss resulting from the sale in 1938 of 120 shares of Hillman Coal & Coke Company 7 per cent preferred stock. Findings of Fact The petitioner sold 120 shares of Hillman Coal & Coke Company 7 per cent preferred stock on December 28, 1938, for $1,260. He had acquired 50 shares of preferred stock of United Coal Corporation in 1919 as a part of his compensation for personal services rendered to the corporation. The name of the corporation was changed from United to Hillman Coal & Coke Company in 1919. The value of those shares at that time was $3,750, and the petitioner reported that amount as a part of his income for 1919. They were a part of the shares sold in 1938. The petitioner received 70 shares of Hillman Coal & Coke Company 7 per cent preferred stock as compensation from that company in 1920 subject to an agreement not to dispose of the stock until a law suit was terminated. The petitioner did not report the receipt of this stock as income for 1920 or any subsequent year. The record does not show the fair market value of the stock when *60 received in 1920 subject to the restriction or when the restriction against alienation was removed. These were a part of the shares sold on December 28, 1938. The petitioner, while this proceeding was pending, sent the collector a check for additional tax for 1920 upon receipt of 70 shares of Hillman 7 per cent preferred in that year and waived the statute of limitations. The collector has not cashed the check. Opinion The only question raised in regard to the claimed loss on the sale in 1938 of 120 shares of Hillman Coal & Coke Company 7 per cent preferred stock is as to the petitioner's basis for loss on that stock. It is shown that 50 shares of the stock were received in 1919 and reported by him as inceived in 1919 and reported by him as income on the basis of a value of $75 a share. That gave him a basis of $3,750 on those particular shares and entitled him to the loss claimed on those particular shares. The other 70 shares were received by him in 1920. They were subject to a restriction in that the petitioner had agreed not to dispose of them until a certain lawsuit was terminated. He did not report the receipt of those shares as income for 1920 or for any subsequent year. *61 Recently, during the pendency of this proceeding, he sent the collector a check for additional tax for 1920 and stated that he waived the statute of limitations. It is not clear that the stock was income for 1920. A restriction upon its sale might have materially affected its value. Cf. . The record does not enable us to say when, if ever, it should have been reported as income or what its basis should be, if any. Therefore, as to these 70 shares the petitioner loses for failure of proof. Fraud Issue Findings of Fact No part of the deficiency for 1938 was due to fraud with intent to evade tax. Opinion The Commissioner, in determining the deficiency, did not determine that any part of it was due to fraud with intent to evade tax. The fraud issue was belatedly injected herein by a second amended answer filed when the case came on for hearing for the second time. The first hearing had been continued and the second hearing was also continued, apparently because of the filing of the second amended answer raising the fraud issue which required the later filing of a reply by the petitioner. The statute places the burden of *62 proof on the fraud issue upon the Commissioner. Section 907 (a) of the Revenue Act of 1924 as amended. Rule 14 of this Court provides that the answer shall contain a statement of any facts upon which the Commissioner relies to sustain any issue raised in respect of which he has the burden of proof. The only allegations of fact contained in the answer, relating to each of the two bad debt deductions, are the amount of the debt charged off on the return and the name of the debtor. Obviously, such allegations are inadequate under the rule of the Court and the answer might have been stricken. However, the petitioner replied to those allegations and the record now contains evidence in regard thereto. We are satisfied from that evidence that no part of the deficiency for 1938 is due to fraud with intent to evade tax. Clearly there was no fraud in failing to report the interest or rental on the certificates of the Paden City Pottery Company. We have held that those amounts were not taxable income to the petitioner reporting on the basis of cash receipts, and since it was not income, obviously there was no fraud in failing to report it. Furthermore, even if it should be held that this was *63 income constructively received by the petitioner in 1938, still he had reason to believe that it was not taxable income for 1938, and his failure to report it would not indicate fraudulent intent upon his part to evade tax. We have held that the petitioner is entitled to a large deduction for worthless debts due him from South Euclid. The amount claimed on the return was much larger than the amount now held deductible, but the Commissioner does not rely upon this difference to establish fraud. A large part of the difference is due to the elimination of $10,000. The petitioner, upon cross-examination, was shown his return for 1937 in which he had deducted $10,000 of this debt as partially worthless at that time. It is not clear whether or not the Commissioner allowed that deduction for 1937. His action in disallowing the deduction for 1938 is some indication that he would not have allowed the partial deduction for 1937, but all that the petitioner was able to say was that he didn't think it had been allowed for 1937. Since he claimed the deduction and did not prove that it was not allowed, we have eliminated the $10,000 from the 1938 deduction. The Commissioner, as said before, *64 does not rely upon these discrepancies but attempts to show a much more fundamental defect in the petitioner's claim to the South Euclid bad debt deduction. He argues that the fraud began in 1934 and there never was any debt of $32,000 due to the petitioner from South Euclid. He relies upon an agreement, which is in evidence, in which the petitioner had agreed with Worthington that neither Worthington nor his assignee would be liable for any of the debts of Green Road. He also contends that the assets sold to South Euclid were not worth $32,000. We confess considerable difficulty in following the logic of this argument. The petitioner had a large loss in 1934 from the failure and dissolution of Green Road. He established his right to a deduction for that loss in a prior proceeding in this Court upon which both parties rely. The assets sold to South Euclid had substantial value at that time, as had the notes of South Euclid received by the petitioner in 1934. He allowed credit for the face amount of the notes in computing his loss for 1934 on the amounts due him from Green Road. This Court did the same. The evidence herein indicates that the sale to South Euclid was "at arm's length" *65 and the $32,000 was about the value of the assets sold. It is true that there was nothing to secure the notes except the assets and their profitable use by South Euclid, but Worthington, who had had experience in such matters, believed that he could make a success of South Euclid. It is possible that the petitioner, in 1934, was taking precautions to protect his future right to a further deduction if South Euclid failed to pay the purchase price of the assets as represented by the notes. But he had a basis of $32,000 on those notes and would suffer real loss if the notes were not paid. He was not acting fraudulently in what he did in 1934 to see to it that he had a basis on the notes for possible future loss, nor was he acting fraudulently in claiming a deduction in this connection for 1938. The respondent's final contention on the fraud issue is that the alleged debts due from Grant were largely fictitious since they had been built up from 1931 through 1934 by advances to Grant which were offset almost immediately and almost completely by reimbursements in the form of checks from Miller to the petitioner. He says that Miller was the financial agent for Grant. The record shows that *66 checks from Miller to the petitioner matched in striking regularity the advances made by the petitioner to Grant upon which the petitioner relies to establish this debt. This evidence, in the absence of further explanation, might justify a suspicion that the alleged debt was not bona fide, but the coincidence is explained in the record. Miller also owed the petitioner a substantial amount in 1934, as shown by the tri-party agreement which is in evidence. Miller had mined out all of its coal and was engaged principally in selling the coal mined by Grant. The checks from Miller to the petitioner, to which the respondent refers, were credited by the petitioner, first, to reduce the debt due him from Miller. Those checks passed from Miller to the petitioner prior to the triparty agreement in which both Miller and Grant acknowledged the exact amount due from each of them to the petitioner. The record certainly does not show that there was anything fraudulent in the action of the petitioner in charging Grant with certain advances and shortly thereafter crediting Miller with similar amounts. It appears that Grant needed the money which the petitioner was advancing, much of it to meet immediate *67 payrolls. We have held that the petitioner is not entitled to any deduction for 1938 on account of any debt from Grant becoming worthless in that year. The evidence also indicates that the petitioner was careless in fixing the amount which he claimed on his return for 1938 as a bad debt due from Grant. However, it has been held that the Commissioner can sustain his burden on a fraud issue only by clear and convincing proof. ; ; , affirmed . Here there is no clear and convincing proof that any part of the deficiency for 1938 was due to fraud with intent to evade tax. 1939 Issue The only issue relating to 1939, which is presented for decision, is whether the petitioner realized taxable income in 1939 from a recovery on a debt charged off in a prior year. Findings of Fact The petitioner claimed and was allowed a deduction of $1,215 for 1931 representing a worthless debt due from Ralph D. Young resulting from endorsement and payment of Young's notes. The petitioner, as trustee for himself and two Eichleays, recovered $1,125.38 *68 in 1939 from Young's widow and daughter. The Commissioner added this amount to the petitioner's income in determining the deficiency for 1939. The petitioner and the Eichleays were creditors of Young. They bought certain property of Young's, including his home, after a sheriff's sale in 1930 for $5,069.81, hoping thereby to protect other claims which they had against Young. They agreed that the petitioner should act as trustee for the three and that recoveries made by him should be applied first to repayment of the funds advanced to make up the $5,069.81 before being applied to the separate claims of the individuals. Young's family continued to occupy their home and were to pay rent to the petitioner as trustee. The $1,125.38 was not applicable to the petitioner's individual claims against the deceased Young and was not to be retained by him personally. Opinion The $1,125.38 which was recovered in 1939 was not the recovery of a bad debt which the petitioner charged off in a prior year. It was not recovered from the debtor, it was not applicable to the debt charged off in 1931, and it did not belong to the petitioner individually. He received it as a trustee for himself and two *69 others, and in accordance with his agreement with those other two persons, this recovery was applicable to the repayment of other advances made by the three persons. The Commissioner erred in including this amount in the petitioner's income. Decisions will be entered under Rule 50. Footnotes
*. Order of the Tax Court, dated December 7, 1945, reads as follows: "Upon hearing of the petitioner's motion for revision of the findings of fact and opinion of the Court relative to the deduction allowed the petitioner for 1938 upon a bad debt due him from the South Euclid Stone & Supply Company, it is "ORDERED, that the record be opened to permit the introduction in evidence by the petitioner of the file of the proceedings before this Court at , and that evidence having been admitted, it is hereby found therefrom that the petitioner was not allowed a deduction of $10,000 or any part thereof for the year 1937 representing a partially worthless debt due from the South Euclid Stone & Supply Company, and the opinion of the Court is hereby changed to allow a deduction for 1938 of the full amount of the debt, $24,523."↩